[Civ. No. 4733.  Second Appellate District, Division Two.—June 13, 1927.]

In the Matter of the Application of WALTER H. STEVENS for Re-admission to the Bar After Disbarment.

[1] ATTORNEY AT LAW—DISBARMENT—APPLICATION FOR RE-ADMISSION—REFEREES—FINDINGS.—Referees appointed by the court to take evidence and present findings, in a proceeding for re-admission to the bar after disbarment, are limited as to their findings to the issues specifically designated by the court, and a finding by the referees as to matters not within the terms of the reference is not a finding of fact.

[2] ID.—EVIDENCE—DEMEANOR OF WITNESS—EFFECT OF TESTIMONY.— In such a proceeding, where only one of three referees heard the petitioner's testimony, the court will review the testimony as shown upon the face of the record untrammeled by the rule that he who hears a witness testify and who observes his demeanor while doing so is the best judge of the effect to be accorded his testimony.

[3] ID.—EVIDENCE—SUPPORT OF FINDINGS.—In such proceeding, where the reference was special, with leave to except to the findings made, the rule that on appeal a finding must be upheld if there is substantial conflict in the evidence is inapplicable, and the court is to ascertain where lies the preponderance of evidence in determining whether the evidence is sufficient to support the findings.

[4] ID.—MORAL QUALIFICATIONS—EVIDENCE—FINDINGS.—In such proceeding, the evidence was sufficient to show that petitioner was not evasive in his testimony; that he was not unduly self-defensive in his attitude; that his denials were not such as to reflect upon his moral character; that he did not offensively criticise or challenge the integrity of the courts or of their officers; that the impression left upon his memory by the occurrences which preceded his disbarment was not of such a character as to reflect upon his morals; that his forgetfulness of facts included in those occurrences was neither unnatural nor censurable; and that petitioner possessed the necessary moral qualifications to entitle him to reinstatement.

(1) 6 C. J., p. 615, n. 85.  (4) 6 C. J., p. 615, n. 84.

3. Conclusiveness and weight of findings of fact by master, note, 19 Ann. Cas. 908.  See, also, 22 Cal. Jur. 697; 23 R. C. L. 299.

APPLICATION for re-admission to the bar after disbarment. Petitioner found to possess necessary moral qualifications; test as to his mental qualifications to be submitted to State Board of Bar Examiners.

The facts are stated in the opinion of the court.

James D. Randles for Petitioner.

Oscar Lawler, Guy R. Crump and Norman Sterry for Los Angeles Bar Association, Respondent.

WORKS, P. J.—This matter, pursuant to procedure laid down by us in the opinion *In re Cate*, 77 Cal. App. 495 [247 Pac. 231], was sent to referees with directions to take evidence and present findings of fact based thereon. The referees have completed their labors and have returned their findings, together with a record of the evidence submitted to them. The matter is now before us upon exceptions to some of the findings, and for a determination as to what step shall next be taken leading to a final disposition of the proceeding on the merits.

[1] The referees have stated the following as one of their findings: "Petitioner's present state of mind respecting the facts which led up to his disbarment is one of evasiveness, self-defense, denial of and reluctance to admit material facts, a criticism of, and a challenge to the integrity of the courts of this state, and of its officers. It is also a fact that petitioner's lamentable experience has not made a lasting impression on his memory, and the record of his testimony shows much forgetfulness on his part of material facts in connection with which he was an active participant, and which led up to his disbarment."

In effect, the matter thus set forth is not a finding of fact, for it is without the terms of the reference. By the order of the court defining their powers and prescribing their duties the referees were directed to report the evidence taken by them, together with their "findings upon each and every one of these issues, except that a finding may be omitted upon the third if the finding upon the second is in the negative: (1) Whether or not the applicant is possessed of such moral qualifications as to entitle

him to a reinstatement. (2) Whether or not there is such doubt as to the mental qualifications of the applicant that an examination is necessary to test them. (3) The character and extent of the examination to which the applicant should be subjected" (*In re Cate, supra*). The specific designation of the issues upon which the referees were to find operated as a limitation upon their powers in that regard. Notwithstanding this conclusion, the matter above quoted from their report will be referred to hereafter as finding IV, as the referees so term it.

[2] Upon one of the issues submitted to them the referees found: "V. Petitioner is not possessed of such moral qualifications as to entitle him to be reinstated as an attorney and counselor at law with the right to practice before any of the courts of the state of California." This finding henceforth will be designated by the number thus assigned to it.

Exception is taken to finding V on the ground that it is not supported by the evidence. In disposing of this contention we shall consider the matters set out in finding IV, treating them as arguments or reasons intended by the referees to uphold finding V. Such, doubtless, was the purpose of the referees in framing finding IV. That finding opens with a reference to the facts which led up to petitioner's disbarment. Those facts need not be stated here, as they are set forth fully in the opinion *In re Stevens,* 59 Cal. App. 251 [210 Pac. 442]. Petitioner was a witness before the referees, and he was cross-examined minutely concerning the delinquencies which had caused his downfall, the main purpose of the cross-examination being to ascertain the present attitude of petitioner toward those occurrences of the past. It is evident from finding IV that the referees concluded that the purpose was accomplished, and to the detriment of the petitioner. We have read carefully the testimony of petitioner with a view to a consideration of the conclusions set forth in finding IV for the purpose of passing upon the sufficiency of the evidence to support finding V. In solving the problem thus presented we must take the record upon its face, untrammeled by the rule that he who hears a witness testify and who observes his demeanor while doing so is the best judge as to the effect to be accorded his testimony. One

only of the three referees, all of whom have signed the referces' report, heard petitioner's testimony. The majority of the referees, then, made the findings from the typewritten page. We, therefore, follow the law when we scan the findings from the same standpoint.

[3] Nor are we, in considering the sufficiency of the evidence to support the findings, concerned with the rule that on an appeal a finding must be upheld if there is a substantial conflict in the evidence directed to the issue found upon. The reference having been special, with leave to except to the findings made (*In re Cate, supra*), we are to ascertain where lies the preponderance of the evidence and to decide accordingly (*Cappe* v. *Brizzolara,* 19 Cal. 607; *Clark* v. *Millsap,* 197 Cal. 765 [242 Pac. 918]).

[4] Let us first consider that part of finding IV which relates to petitioner's evasiveness, his inclination toward self-defense, and his denial of and reluctance to admit material facts bearing upon the cause of his disbarment, while he was a witness before the referee who heard his testimony. Petitioner was a very poor witness. It was difficult for him to answer questions directly. His answers were often unresponsive to questions, and the cross-examiner, because of petitioner's peculiar method of testifying, was compelled, often, to retraverse ground that had already been gone over, in order to get proper responses. All this does not mean that petitioner was evasive or that he was reluctant to admit material facts. His testimony is consistent with the idea that his is the turn of mind which is frequently met with on the witness-stand. A witness may be thoroughly honest without the ability clearly to tell his story in response to questions. He may be possessed of a fervent desire frankly to unbosom himself, but may not know how to do it. As we read the record of petitioner's testimony, he appears to be one of these unfortunates.

As the outcome of this proceeding is of great moment to petitioner, as it and other proceedings like it concern vitally the public welfare, we find it necessary to quote somewhat fully from petitioner's testimony, in order properly to present on paper what we see in it.

In our opinion in a former proceeding in which petitioner sought to be re-admitted to the bar (*In re Stevens,*

*supra*) we said, after reciting the principal part of the facts which caused his disbarment: "There is yet another chapter in the story of petitioner's misdeeds. Not content with his piratical raid upon the purse of the individual through whose fears he had procured the payment of the sum of $2500, he reported to his clients that the sum paid him was $1000. The truth as to this matter was not ascertained by them until long afterward." An inquiry into this matter was one of the prominent features of petitioner's cross-examination before the referee. The record shows: "Q. Do you recall also in the course of these proceedings it developed that you had received $2500? A. I believe that is what Mr. M . . . gave. Q. Don't you remember also that you turned over $1000 of that money to the mother of the Levy woman? A. I think they were both there. Q. Well, you turned it over to both of them and you retained the balance of $1500? A. There was a certain amount paid at one time. Q. And it developed, proofs developed, and it was a fact that you never did report to the girls that you had received the $2500 until after that developed in the trial [of a man who was indicted by the grand jury because of alleged unnatural practices with the women referred to in our former opinion as the "Jonquil girls," which trial will be referred to hereafter as the B . . . trial] ? A. No, I don't believe you will find that the records bear that out." The cross-examiner then read to petitioner the matter above quoted from our former opinion, and the record proceeds: "A. That was contradicted by the testimony in the court. Q. Well, I don't remember exactly as to the testimony of those persons themselves—you do remember that you were confronted yourself with the checks bearing your endorsement? A. Oh, yes, I deposited the money in the bank—everything was—everything was in check form. . . . Q. Did it not occur to you in the course of your pursuits of these matters that it was a mere scheme on the part of these women to extort money from these men? A. No, that never entered my mind—it never entered my mind at all—I have the letters—special delivery letters that were sent to my office demanding that these actions be dismissed. Q. Who demanded that they be dismissed? A. Marie Levy—I have her mother's letter. Q. That was no doubt after the trial of the B . . . case when

it developed, at least the testimony developed, that you had received $2500 from Mr. M . . . and turned over $1000 to the Levy woman? A. I don't think that had anything to do with it—they were friendly—I meet them now—the daughter is married and living in Fresno—if they thought I was a robber they would not meet me and appear so friendly, and they have a dozen times. Q. After the B . . . trial—after the testimony you will recall that Mrs. Lacy and her daughter did testify that they had gotten only $1000. A. They testified they did get something, yes. Q. And you remember at that time they created a good deal of excitement as far as they were concerned? A. I don't remember it did. Q. Don't you remember that you gave them your note for $500 of the money? A. What date was that? Q. This was anywhere in October. A. The trial was in September, 1913. Q. And after the trial was had you gave them your note for $500? A. It was not given them for that purpose. Q. What other reasons did you have? A. There was some—there is another—I want to explain the note now—it is an absolute surprise to me. Q. . . . You do recall as I stated that considerable excitement was created through the development or testimony of Mrs. Lacy and her daughter, Miss Levy, that they had received $1000 from you—and the testimony that developed in the course of the trial by the production of the checks in the course of your testimony that you had received $2500? Was it not a fact that the mother paid for the trial of these other cases that grew out of the first case—is that not the testimony? A. I accepted the general facts, I think. Q. I think she paid for the other cases brought here out of the first trial? A. I don't know whether she did or not—I believe the mother knew all the while what the money was—I believe she testified the mother received the money at one time and the girl at another. Q. Well you have no present recollections why you gave her your note after the B . . . case was concluded? A. No, I do not think the excitement was at the trial in the federal court—was not that testified to in the federal court? Q. Yes, it was testified to there too. A. You see I was not in the courtroom at the B . . . trial. Q. You remember it was something that attracted some newspaper attention— Mrs. Lacy and her daughter testified that they had received

a thousand dollars, suppose— A. Now, I tell you, . . . I did not take any money that was wrong. Q. I want to get the fact correctly stated in the record—you recall that Mrs. Lacy and her daughter testified that they had received from you on account of moneys collected from Mr. M . . .— A. I won't say that that was the amount they got, but the amount is in the evidence. Q. You gave them an amount very much less than $2500.00? A. Yes, they got less than that—we got attorneys' fees—I don't think that was attorneys' fees, it was other work we had been doing for them. Q. Then after the case was over, you recall that Mrs. Lacy accosted you in the hall of the Hall of Records, if I remember correctly, and there charged that you had only told her you had received $1000, and demanded that you make restitution in reference to the cases that had not been reported; and as a result of that you thereafter gave to her this note dated October 14, 1914? A. No, I don't—I don't remember giving her the note. Q. It is a fact, Mr. Stevens, that these matters in which you were involved were not sufficiently impressive— A. They were impressive—but I was—but if a person takes them with him, he gets off all right—a man is charged with fraud—those girls were turned absolutely against him—but in the other suit they were not—I was up in the air— I had never been on trial before and I had lived a straight, upright life—there is not a man in this city who has a straighter record than I have." These extracts from the record appear to show the portions of the testimony of petitioner which will most nearly justify the part of finding IV which is now under scrutiny, and which will show, as well, the peculiar manner of petitioner as a witness, although there is much more in the record, at different points, to the latter purpose.

It is said in finding IV that the present state of mind of petitioner respecting the facts which led to his disbarment is one of "criticism of, and a challenge of the integrity of the Courts of this State, and of its officers." We shall state such portions of the testimony of petitioner—and there is no other evidence touching the subject—as seem to bear upon the conclusion thus expressed. At the opening of the cross-examination of petitioner he was asked if he questioned the statement of facts contained in our former

opinion. He responded: "I have never questioned the decision of any of the justices—I have not been a frame of mind to question their decisions." The last word probably was put in the plural for the reason that division one of this court also once denied an application for petitioner's re-admission to the bar (*In re Stevens,* 63 Cal. App. 682 [219 Pac. 1014]). During petitioner's cross-examination the following occurred: "Q. You did, of course, learn through your knowledge of the trial of the B . . . case, and the notoriety which these cases received that these women were common prostitutes, did you not? A. I would not say for certain—it is hard thing to say—they were both married, I am glad to say, they are living the way they are—they are getting along very fine. Q. Well, now, after learning, notwithstanding your attention being called to the facts through the testimony or records of the B . . . case you still continued this litigation on the records and did not dismiss it—dismiss the suits until you received orders from them to do so some months afterwards? A. I told you . . . I have always believed that transcript of the grand jury in writing—the grand jury believed it, then why should not I? Their testimony was taken before the grand jury—those girls told me—what other reason had I to believe such things? In the first place, it was a very unfortunate circumstance that I should be singled out by a judge of the Superior Court for such a thing as that— and brought around as it was, it seemed something wrong." The record of the cross-examination also shows this: "Q. Now you realized, did you not, that upon its very face, this proceeding bore indications or at least would justify the inference upon the part of anyone outside at least, that it savored very much of blackmail? A. No, sir, that is the last thing I had in mind; if I had, I never would have touched it. I tell you the first thing that came up when that thing came up of blackmail, it hurt me very much for the simple reason just to think that a rich man could get away with anything, and then they would charge a person with going after him with blackmail. That is the way it hit me then. If you didn't have money, the case would have been tried and nothing would be said, but as long as a man has got money, it is blackmail."

The referees have said in finding IV that "petitioner's lamentable experience has not made a lasting impression on his memory, and the record of his testimony shows much forgetfulness on his part of material facts in connection with which he was an active participant, and which led up to his disbarment." It is true that petitioner had forgotten many of the specific facts which led to his disbarment, but we think that circumstance is neither strange nor reprehensible. Naturally, he might have forgotten many of the details of his experience because of the mere lapse of time. The lamentable occurrences of the past happened thirteen years before his appearance at the hearings which the referees conducted, and he continually refers to that fact in his examination as a reason for his inability to answer some of the questions put to him. Then, too, it is quite likely that petitioner must have endeavored to lay aside a recollection of events which, if kept in mind, must have been a continual nightmare to him. The human thinking mechanism has the switches and controls wherewith to throw off the recollection of those troubles with which, according to Job, we are all full. The human being who does not employ them is no philosopher and will be carried to an early grave because of his unwisdom.

The record shows, beyond a doubt, that petitioner has kept in mind the main features of his unfortunate experience. His present state of mind, which, after all, is the thing to be ascertained here, may be exhibited by extracts from his testimony. On his direct examination he was asked: "Are you a member of any fraternities?" To this interrogation he made an answer which is characteristically unresponsive in part: "Yes, of the Odd Fellows and Masons. I took one degree in the Masonic lodge when this matter came up, and I refused to take any more until my name was cleared—I was not requested by anyone—I told them I did not care to go any further until I could clear my name." On his cross-examination this occurred: "Q. Do you now regard these suits [figuring in his disbarment proceedings] and the activities in connection therewith in the light of ordinary damage suits? A. No, if I was at the present time made guardian *ad litem* in a case as I was then—upon the ground that I did not want to handle that kind of case at all—nevertheless they made me guardian—

a man may take a young girl and treat her as he sees fit and it is dangerous for a young attorney to attempt by civil action to gain anything—the criminal courts are the only courts for that kind of work.'' The cross-examination also shows this: ''Q. . . . Isn't it a fact that you know and realize that whenever a suit is brought by a woman of loose morals against a man of standing and character and of means, for any alleged improper relations, that the natural and ordinary inference is that the suit is one that savors of blackmail? A. Why, yes, I will say that to some extent it does, but it didn't enter my mind at that time for one instant. Q. Now, realizing that that was the natural inference— A. I wouldn't say that I knew it then; I will say I do now, yes.'' This also appears in the cross-examination: ''Q. . . . Now at the present time does it not seem to you as a lawyer that to file suits on behalf of women who were of . . . loose character . . . against any man, and particularly against men of apparent means and standing, justified the application thereto of the term blackmail? A. Well, I didn't think that. It hurt me very much at that time to have it brought out that way, but I understood from different things that that was the cause it was brought out for, that people thought they were trying to get money by blackmail means. If I had thought that, then they would never have gotten to my office. If the girls had asked me to bring suit, I never would have brought it. Q. That is the best answer you can give to the question? A. You mean at the present time? Q. Yes. A. No, at the present time I wouldn't take one of those cases for any amount of money. If I was practicing law now, they wouldn't get that sort of stuff over with me. I wouldn't bring an action for anyone on a charge of that kind until, by Jove, I was ready and willing and able to know that the facts were there and I could convict if there was ever a trial.'' This, also, the cross-examination shows: ''Q. Well, what is your theory now? A. Well, I wouldn't take a case of this kind. Q. I didn't ask you that. What is your theory now, your legal theory as to how any such action as the actions like these could be maintained? A. I wouldn't attempt to maintain them. If I made an investigation and found out that they were loose women and that they were not chaste women prior to the time of this

thing—I wouldn't bring it, anyway—but if the investigation was brought in in that way, I absolutely would throw it down."

Traversing the conclusions stated in finding IV, as a support for finding V, we think petitioner, in his testimony, was not evasive; that he was not unduly self-defensive in his attitude; that his denials, few of which we have found it necessary to set out above, were not such as to reflect upon his moral character; that he did not offensively criticise or challenge the integrity of the courts or of their officers; that the impression left upon his memory by the occurrences which preceded his disbarment is not of such a character as to reflect upon his morals, and that his forgetfulness of facts included in those occurrences is neither unnatural nor censurable.

We turn now to other evidence bearing upon the issue passed upon in finding V. Since his disbarment petitioner has been in the employ, continuously, of the Los Angeles Railway Company. He testified: "I first went to work on the cars as a conductor, and then from the cars I was made inspector, promoted to inspector, and then from inspector I was promoted to supervisor, and from supervisor I went into the manager of transportation's office, was assisting him in some respects, and I have been there ever since." A part of petitioner's duties as an assistant to the manager of transportation was stated by petitioner thus: "Mr. Anderson, the manager of transportation, would send lots of the boys, trainmen I would say, who would come to Mr. Anderson quite frequently and ask him for information concerning one thing or another, employment or road trouble or maybe family trouble, not legally, nothing of a legal nature, and Mr. Anderson refers them to my office, and if it was of a legal nature, I would tell them they would have to get some attorney, and if not, the other work I could attend to in the company, employment work or anything of that sort."

The extent to which petitioner is trusted by his superior officers, in the performance of the duties above mentioned, and others, is shown by testimony contained in the record. George Baker Anderson, the manager of transportation, testified: "I am very familiar with his life, extremely familiar with his life during the hours of daylight, practically

all the hours of daylight. I see him every day intimately. . . . Mr. Stevens is occupying a confidential position of some importance in my office, my department of the Los Angeles Railway. . . . He has charge of research work and investigations, and also looks after the requirements of many of the men in the employ of the company when they are in trouble and need advice, consultation and consideration. . . . I receive every month from Mr. Stevens a report of the employees who have been in trouble of various kinds and have needed to have help of that nature. . . . They are conductors and motormen in my department. I have charge of the conductors and motormen and those who operate the system, operating the cars. Some of them are supervisors and some in some other departments, and they are all men of that type. . . . Sometimes a man would have his wages garnisheed. He would have a suit against him for rent maybe or trouble in relation to his household affairs or things of that kind, a variety of things of that kind. Sometimes these men would come to me and I would refer them to Mr. Stevens and it is generally understood in our department that Mr. Stevens was in a position where he could look things up and could tell them how to proceed, and frequently they would have to leave his office and go to some other legal authority. . . . His classification is that of an assistant to me and he has several classes of duties. One is to gather information of value to the community at large and to the railway in regard to transportation and means of transportation, property locations, manufacturers and industries, and the number of people employed, and the needs of the various manufacturers for transportation. Another duty is this work to . . . which I have just referred, giving advice and conferring with people who are in trouble. . . . Q. What time would you say that he spent in this matter that you have referred to, giving advice to employees? . . . A. I should just judge off hand without being able to state positively, I suppose that in the course of a month the suits would average—and I have in mind the last few reports that I have seen there—an average of forty or fifty or sixty in the course of a month; sometimes three or four or five in a day. Q. Does he on those reports give you a brief statement? A. Yes, sir; the names of the people he has seen and the cause of it, the cause of their troubles—

. . . what the trouble is. Q. And then a report as to what he has done in connection with it? A. Not a full report. . . . I ceased to ask for that some time since because I found out generally that everything had gone so well with him, and the employees were so satisfied with the treatment that they had had that I figured I would leave him alone when he fulfilled his duties just the same as the heads of other departments. . . . Q. Was this position which he occupies now considered in the line of a promotion from the services he was performing before? A. Oh, yes, indeed. I consider it a very important position and I put him there because I learned to trust him, his discretion and his honesty in dealing with men. . . . As a matter of fact . . . he is the only man I know of around the office that is in any way available that I would have on the job."

Mr. Anderson also testified to the morality and good citizenship of petitioner, and other witnesses testified to the same effect and to his fidelity to duty. Testimony was also heard by the referee showing the satisfactory conditions which exist in the home of petitioner, who is married and has a daughter of the age of nineteen years. No evidence was offered for the purpose of showing that petitioner is deficient in morals.

We find that the great preponderance of the evidence is against finding V of the referees, and that the finding should not be adopted as the finding of the court.

Finding VI of the referees reads: "If the applicant did possess the necessary moral qualifications to entitle him to be reinstated as an attorney and counselor at law, with the right to practice before all Courts of the State of California, such doubt exists as to his mental qualifications that an examination will be necessary to test his mental qualifications. The extent and character of such examination should be the same to which other applicants for admission to practice law in the State of California, after examination, are subjected." Without a discussion of the evidence we think this finding is amply supported by it and should be adopted as the finding of the court.

We find that petitioner is possessed of the moral qualifications necessary to entitle him to re-admission to the bar and the finding of the referee to the contrary is set aside. The finding of the referees as to mental qualifications, and

as to the necessity for an examination to test them, is adopted as the finding of the court, petitioner to submit himself for examination at the next session of the State Board of Bar Examiners in Los Angeles, or at the session in that city early in 1928, as he may elect. The time for such examination may be further extended by the order of the court upon good cause shown therefor.

Craig, J., concurred.

Thompson, J., deemed himself disqualified, and did not participate in the foregoing decision.