[Civ. No. 5303. Second Appellate District, Division Two.—August 22, 1927.]

In the Matter of the Application of VERNON CRUICK-SHANK for Reinstatement as Attorney and Counselor at Law.

Kimball Fletcher for Petitioner.

Guy R. Crump and Eugene Overton for Respondent Los Angeles Bar Association.

WORKS, P. J.—This is an application for re-admission to the bar after disbarment. Petitioner was disbarred in 1918 because of the commission of an act involving moral turpitude. The grounds upon which he was excluded from the profession are shown in the opinion *In re Cruickshank*, 47 Cal. App. 496 [190 Pac. 1038], by which the judgment of disbarment was affirmed. The present proceeding was sent to referees with directions to take evidence and to find whether petitioner is possessed of the moral and mental qualifications necessary to entitled him to a re-admission. The findings of the referees are now before us.

The referees find that petitioner "is possessed of such moral qualifications as entitle him" to re-admission. This finding is so amply sustained by the record made before

the referees that we forbear to state the evidence which supports it.

■ Upon the other issue it is found by the referees that "there is such doubt as to the mental qualifications of applicant that an examination is necessary to test them." Petitioner has interposed written exception to this finding, and we have therefore been inspired to a minute exploration of the record upon which the finding is made. Petitioner, after having had a common school education—during the course of which, however, he did not complete a high school course—and after having read law a little, matriculated with the Chattanooga College of Law, in Tennessee, which conducted a three-year course. He was permitted by the dean of the school to enter the junior class, however, his course thus being limited to two years. At the end of his first year, after having done both junior and senior work, he took a bar examination before the state board of examiners of Tennessee, passed and was admitted to the bar. Notwithstanding this fact he completed his second year. In his course during the two years, comprising a term of eight months in each, he took lectures in twenty subjects. One who was an instructor in the law school during petitioner's attendance testified that petitioner passed all his examinations, that "in many of his subjects he was at the head of his class, and in many others near the head of his class," and that when he left the school "he had a good legal foundation." Soon after completing his law school course petitioner came to California and was admitted to the bar of the state. This was in 1916. He was engaged in the active practice of the profession until a short time before his disbarment in 1918. We have carefully examined a file in which is presented copies of notices of motion, affidavits, pleadings, trial briefs, findings, judgments, decrees, and other papers prepared by petitioner during the period of his practice. These various documents were filed with the referees as a part of the record before them. At the hearing before the referees petitioner testified that during his practice he was engaged in actual trial work "two or three times a month," and a lawyer with whom he was associated immediately preceding his disbarment gave a minute description of the nature of his practice and of the manner in which he performed his work. From all this evidence we find

that at the time of his disbarment petitioner was possessed of at least average ability as a lawyer, and his ability was perhaps above the average for one who had practiced for so brief a period—only about two years.

The question yet to be determined is whether petitioner, during the period since his disbarment, has kept this ability intact by his methods of thought and through the nature of the pursuits which he has followed. Immediately after his disbarment petitioner engaged in a business enterprise which operated in that part of Los Angeles known as San Pedro. The business was soon incorporated under the name of the Channel Construction Company. The nature of the operations conducted by the corporation was thus described by its president: "This corporation was incorporated for the sum of $50,000, but it has acquired property, both real and personal property, of the approximate value of $600,000. It has in a large way done excavating and filling work in San Pedro, taken public contracts for the excavation, filling and improvement of public streets and paving and matters of that sort, upon occasion there being as many as 90 to 100 men employed, and I think there has been about a million cubic feet of earth that has been excavated, and great areas filled in the West Basin of San Pedro and San Pedro proper, involving many hundreds of thousands of dollars." Petitioner owns half of the stock of the corporation and has been in active control of its operations as manager. We shall now quote from the testimony of several witnesses who appeared before the referees. The president of the corporation above mentioned, who is a lawyer, said: "Mr. Cruickshank . . . has had charge of the actual operations, the making of contracts, and the collection of moneys during practically all this period. The legal phases of the matter, and matters to some extent of policy, have been mutual affairs between the officers of the corporation and Mr. Cruickshank. . . . Of course in conducting this business—it is really one of the largest businesses in San Pedro, where we have handled innumerable contracts, and many, many legal questions have arisen that were of interest to all of us personally, and while Mr. Lynden Bowring, who is secretary and treasurer of the corporation, and myself handled the legal matters in connection with it, we discussed these questions usually with Mr. Cruickshank, and in an academic way discussed other legal

questions with him, . . . and I came to the conclusion that while probably Mr. Cruickshank was not keeping up, as his business was so onerous there, with all the decisions as they were coming down, yet he had, it seems, books like Corpus Juris and many others in his place that he was endeavoring to keep up with in a considerable, way, and his foundation seemed to be very good. His method of reasoning was logical, and he seemed to have a very good foundation of the general principles of law." Another lawyer said he had known petitioner for four years and testified, further: "Mr. Cruickshank has visited the office I should say on an average of once a week . . . and has discussed legal questions and matters of a character that might pass between lawyers, and of course between business men, too. . . . I have been practicing law for 40 years and I would say that Mr. Cruickshank has as much technical ability as 50 per cent of the lawyers I have known during that time, or perhaps 60." This was said by another lawyer, who spoke of times following the disbarment: "As to [petitioner's] ability, I have found in the matters with which I came in contact with him, that he seemed to possess an ability very much above the normal, and in the matter of the preparation of contracts and in the matters of street law, which were the legal matters concerning which I had occasion to have experience with him, he has shown a very pronounced ability."

One lawyer testified concerning frequent talks he and two other lawyers had with petitioner about the legal affairs of the Channel Construction Company, and said "[I]n all of those matters Mr. Cruickshank seemed to have just as keen a knowledge of the law as any of the rest of us that were talking about it, and seemed to grasp the legal questions involved." Petitioner himself testified: "Q. Since your disbarment, you have retained part of your law library, have you? A. Yes, I am still keeping it up. Mr. Moore [a former associate] has some. The Corpus Juris I am keeping up and I buy different text books that come out on matters of law, and I am keeping up with the code just in a general way." The former associate of petitioner who has just been mentioned said: "[M]y judgment is that [petitioner] is quite capable of handling a law business. . . . In my visits with him our conversations have been usually on general topics, and the thing that has impressed me most was his resolute

ambition to increase his learning, not only in the law but in books generally, and whenever we got into a discussion of some philosophical or historical subject, why, it so awakened his interest that he immediately decided he wanted to find out about it, and I would notice thereafter, when I went to visit his home, that I would find some of these books pertaining to the subject that we had discussed before, which evidenced the fact that his mind still dwelt upon the thought and that he was trying to inform himself. . . . I think he is far superior to a large number and quite a large percentage of our lawyers." The secretary and treasurer of the Channel Construction Company, a lawyer, testified: "Q. From your acquaintance with Mr. Cruickshank . . . have you an opinion as to what his technical ability has been since the time of his disbarment? A. I have. Ever since the Channel Construction Company was organized, it has had constantly presented to it questions of law of all kinds, from mere cases involving collections to matters of considerable interest, involving street improvements and overlapping of street improvements, and the validity of contracts, and matters that have engaged considerable of my time as a lawyer and considerable of Mr. Potter's time, who is president of the company and who is also a lawyer. In all those matters, we have considered them and discussed them in connection with Mr. Cruickshank . . . and have had the benefit if his ideas and opinions regarding them, and I have been . . . in practically constant consulation with Mr. Cruickshank. There hasn't been a week passed in the last five years that I have not had one or several conferences with him in matters that are really the subject of a lawyer. I found that in all those matters that he has a good grasp of legal principles, and also the practical application of them, and I know that my own preconceived ideas on many subjects, that is, as to the application of various principles of law . . . were not correct, and that suggestions made by Mr. Cruickshank proved to be the correct view . . . I lived about a year and a half or so next door to him in San Pedro . . . and I used to see him practically every night during that period . . . and I know that during that period and at other times when I have been at his house, that he has kept law books about him. I know he has continued to subscribe to the

Corpus Juris and Cyc. system, the codes and so forth, and he has kept about him legal literature, and that whenever any question arose, he was looking it up on . . . his own account, and to my own knowledge, he has kept to a considerable extent abreast of the statutory laws as far as it affected our business, which was the street law and the law of contracts and all that sort of thing, and I always found him active in applying himself to the solution of problems that arose in connection with those matters. Q. Would your same favorable criticism extend also to matters in relation to the several large lawsuits which have been conducted and the matters of corporation law that have been met with in connection with the corporation in the way of bond issues? A. Yes, I would say that every question of law of any importance whatever that has arisen, has been discussed with Mr. Cruickshank and his ideas exchanged with mine and Mr. Potter's, and the statement that I have made regarding the soundness of his views would apply to all those matters. I have found him to have in my opinion good judgment. . . . Q. Well, in your opinion, is Mr Cruickshank now qualified from a technical standpoint to practice law? A. He is. In my opinion he is qualified to an extent much greater than the average practitioner . . . that is admitted to the bar. . . . His judgment I have found to be good on questions that have been presented.''

From this state of the record we conclude that the preponderance of the evidence is opposed to the finding of the referees which concerns the mental qualifications of petitioner, and we have recently decided that such a finding must be tested by the question as to where a preponderance of evidence lies (*In re Stevens,* 83 Cal. App. 745 [257 Pac. 218]). We think that as to petitioner's ''grasp of the law there is no question'' (*In re Stevens,* 197 Cal. 408 [241 Pac. 88]).

The finding of the referees that petitioner is possessed of the moral qualifications entitling him to a re-admission to the bar is adopted as the finding of the court. The finding expressing doubt as to his mental qualifications is set aside. The petition for re-admission is granted and the clerk of the court will issue to petitioner a certificate of admission to the bar in the usual form.

Craig, J., and Thompson, J., concurred.